| | | |
|---|---|---|
| **HEMANT K. MODY** | : | **04cv358** |
| | : | |
| **v.** | : | |
| | : | |
| **GENERAL ELECTRIC COMPANY** | : | |
| | : | |

<u>**Ruling on Plaintiff's Post-Trial Motion**</u>
<u>**For Judgment as a Matter of Law or, in the**</u>
<u>**Alternative, for a New Trial or Remittitur**</u>

In this action, plaintiff Hemant Mody alleged that defendant General Electric Company ("GE") had engaged in retaliation in violation of Title VII, 42 U.S.C. § 1981, the Age Discrimination in Employment Act ("ADEA"), the Connecticut Fair Employment Practices Act ("CFEPA"), and the Family Medical Leave Act ("FMLA").

This case was tried to a jury on July 10 through 14, and July 17 and 18, 2006. On July 18, 2006, the jury rendered its answers to the special verdict form in favor of the plaintiff on his claims of retaliation based on race, national origin, and age, and against plaintiff on his claim of retaliation based on the FMLA. The jury found that plaintiff should be awarded $591,423 in back pay, $500,000 in compensatory damages, and $10 million in punitive damages. Additionally, the jury determined that plaintiff was entitled to an award of liquidated damages due to a willful violation of the ADEA. The Court subsequently amended the back pay to $652,768, and awarded $730,406 in front pay and $626,171 in liquidated damages. Judgment was entered in favor of plaintiff for an amount totaling $12,509,345.

Defendant now moves for judgment as a matter of law or, in the alternative, for a new trial or remittitur.

# BACKGROUND

The following briefly summarizes the factual background that is relevant to this ruling.

At the time of trial, plaintiff Hemant Mody was a male over the age of fifty years of Asian Pacific origin, who suffered from severe chronic renal disease, requiring daily treatment of dialysis. In 1988, he was hired by GE Industrial Systems ("GEIS"), a subsidiary of defendant General Electric Company, as a Chief Engineer in New Products Innovation ("NPI"). The Chief Engineer was a Senior Professional Band position, which is subordinate to the Executive Band and Senior Executive Band ("E-Band" or "Senior E-Band") positions at GE.

In 2001, plaintiff came under the supervision of Don McDonald, the Manager of NPI. On July 18, 2002, Mody met with McDonald to discuss his performance evaluation. McDonald ranked Mody in the top 20% of all GE employees. However, when Dr. Mody discussed promotion to E-Band, McDonald informed him that he was on a "technical" career path and could not be promoted beyond the Senior Professional Band. According to McDonald, plaintiff could only be promoted to the E-Band or Senior E-Band by taking an entry level "managerial" path position. This response frustrated and angered Mody because he had noted that younger non-Indian individuals were promoted into the E-Band or Senior E-Band positions regardless of whether they had started on a "technical" or "managerial" career path.

On July 22, 2002, Mody issued a memorandum complaining of discrimination to Thomas Lavalle, Head of Human Resources, and to Chris Fuselier, the General Manager of Plainville. As result of his complaint, Mody met with Mr. Lavalle on August

2, 2002.   In a memorandum dated August 12, 2002, Lavalle responded to Mody's complaint, stating that Mody had failed to provide any facts to support his allegations of discrimination.

In September through November, McDonald, Lavalle and Fuselier monitored Mody's attendance and timeliness.  Mody's arrival at work was delayed due to his need for dialysis, although he accounted for his missed work hours with vacation time. Nevertheless, McDonald informed Mody that he was absent or tardy too often and also complained to Mody about his lack of output. At the same time, Mody experienced a reduction in his role in the project that he had created entitled the Magic Panel, and he was denied attendance at an Asian Pacific American Forum conference.

On October 10, 2002, McDonald gave plaintiff a poor review and a critical evaluation.

On October 29, 2002, McDonald asked Mody to arrive at work no later than 8:00 a.m., which had not been required of plaintiff prior to his complaint.   That same day, Mody complained to Human Resources by e-mail of discrimination and retaliation.

On October 30, 2002, McDonald created write-ups of alleged performance and attendance issues for placement in Mody's personnel file.

In October and November, Mody also attempted to transfer to another department.  Fuselier informed him that he was not eligible to transfer because he had not been in his position for two years.

At the end of October, McDonald and Lavalle worked with in-house counsel Grace Hahn to put Mody on a Performance Improvement Plan ("PIP").

In November 2002, Lavalle refused to permit Mody to attend the GE leadership

conference.  Mody was also required to put together a task list to justify his position.

On December 10, 2002, Heather Pugliese, a younger, more junior co-worker, e-mailed Mody to request that he contact the Department of Energy to gauge interest in funding for the Magic Panel project.  Mody, who viewed this task as menial and inappropriate, refused to comply with this request.

By December 12, 2002, McDonald had removed Mody from having meaningful responsibility on projects, including the Magic Panel that Mody had created, and on that date, Mody complained in writing of discrimination and retaliation to McDonald, Lavalle and Fuselier.  Mody also complained to Lloyd Trotter, the division President.

That same day, Lavalle responded to Mody, stating that he needed more specific details of alleged discrimination and retaliation prior to an investigation.  McDonald and Lavalle both reprimanded Mody for refusing to perform work requested of him by Pugliese.

On December 13, 2002, Mody took a leave of absence due to symptoms of stress.  On January 8, 2003, GE decided to pay Mody the minimum allowable under its disability plan rather than to accord him the full disability benefits.

In a January 21 e-mail, McDonald wrote Lavalle: "Could you let me know what the next steps are with Hemant.  I would like to know when we will take the appropriate steps."  Lavalle responded: "Nothing to do until he comes back to work . . . then we act per our previous discussion.  Do the work requested, if no suspend then terminate.  If he does the work LOW [lack of work] due to business need to reduce costs."

On February 24, 2002, McDonald instructed Mody to contact the Department of Energy by 3:00 p.m. that day.  McDonald explained that failure to follow his instructions

4

would result in disciplinary action for insubordination.

Mody complained to Fuselier and David Foster, who had replaced Lavalle as Human Resources Manager for Technology, that this action requesting that he make a phone call to the Department of Energy was retaliatory. Fuselier and Foster advised Mody that he should perform the work directed by McDonald unless the requested work was "illegal, unethical or immoral." Foster also suggested that Mody resign rather than be suspended or terminated for insubordination.

Thereafter, Mody was suspended without pay, and he was instructed to return his access card and all company property. No investigation into Mody's charges of retaliation and discrimination was conducted.

On February 27, 2003, Mody sent McDonald an e-mail complaining that he had been subjected to discrimination and retaliation and that he intended to return to work.

On March 5, 2003, McDonald sent Mody a letter stating that Mody would be terminated for cause if he did not return to work by Friday, March 7, 2003. The letter was sent by Federal Express but, due to an error in the address, Mody did not receive the letter until March 10, 2003.

Mody did not return to work or contact anyone at GE. On April 4, 2003, McDonald sent Mody a letter notifying him that his employment had been terminated, retroactively effective to March 7, 2003, because of his insubordination and job abandonment.

Subsequent to entry of the judgment in this case, Mody suffered a heart attack and passed away.

**DISCUSSION**

Abatement

As an initial matter, the Court must determine if Mody's death after entry of judgment has an impact on the survival of his claims. It is well established that, in general, "an action is not abated by the death of a party after the cause has reached a verdict or final judgment and while the judgment stands, even where the judgment is based on a cause of action that would not have survived had the party died before judgment." 1 AmJur.2d Abatement, Survival and Revival § 58 (2005); See The Lafayette, 269 F. 917, 927 (2d Cir. 1960); Howard v. Wilbur, 166 F.2d 884, 885 (6th Cir. 1948); Bornstein v. Boucher Agency, Incy., 5 Conn. Cir. Ct. 121, 122-123 (1968).[1]

Defendant argues that the plaintiff's claims for punitive and liquidated damages abated upon his death. Defendant cites numerous authorities, which concern the abatement of actions in which the plaintiff died prior to judgment. Defendant submits that the timely filing of the post-judgment motion compromises the finality of the judgment in this matter. In support of this assertion, defendant advances precedent that concern the effect of a post-judgment motion as a practical matter upon filing deadlines or perfection of a lien. It is well settled that a pending post-judgment motion to alter or amend the judgment or for prejudgment interest operates to suspend the finality of a judgment for purposes of calculating the filing dates for an appeal or an

---

[1]The parties agree that federal common law controls abatement under Title VII and ADEA, and that Connecticut law controls the abatement under § 1981 and CFEPA. Asklar v. Honeywell, Inc., 95 F.R.D. 419, 442 (D.Conn. 1982) (federal common law controls ADEA); Robertson v. Wegmann, 436 U.S. 584, 588 (1978) (state law controls § 1981).

application for attorney fees.  <u>Jones v. Unum Life Insur. Co.</u>, 223 F.3d 130 (2d Cir. 2000); <u>Weyant v. Okst</u>, 198 F.3d 311 (2d Cir. 1999).  Similarly, it would make little sense to record a judgment for purposes of perfecting a lien during the pendency of a post-trial motion for a new trial.  <u>Anastos v. M.J.D.M. Truck Rentals, Inc.</u>, 521 F.2d 1301 (7th Cir. 1975).

Defendant points to another distinguishable authority, <u>American Fed. of Gov't Empls. v. District of Columbia Fin. Responsibility & Mngt. Assistance Auth.</u>, 133 F.Supp.2d 75 (D.D.C. 2001), which held that judgment was not final for purposes of applying a retroactive change of law that came about during the pendency of post-trial motions.  In so holding, the district court relied upon Supreme Court precedent providing that a retroactive change in the law can still have an impact on the final outcome of a case so long as the appeal remains pending.  <u>Plaut v. Spendthrift Farm, Inc.</u>, 514 U.S. 211 (1995).

These authorities have no bearing on whether plaintiff's claims survive his death after a jury's resolution of all factual circumstances and entry of judgment.   Unlike the change of law in <u>American</u> or <u>Plaut</u>, plaintiff's death is a fact that does not alter the legal substance of the judgment during the pendency of post-trial motions. Abatement is not appropriate where "all effectual questions have been resolved" prior to the death.  1 Am.Jur. 2d Abatement, Survival and Revival § 58.  <u>See</u> <u>also</u> <u>Kaufman v. Herrman, II</u>, 748 So.2d 310, 311 (Fla. Dist. Ct. App. 1999) (death does not extinguish judgment even while post-trial motions are pending); <u>Garrett v. Byerly</u>, 155 Wash. 351, 352 (Wash. 1930) (same).  Defendant provides no authority holding that a post-judgment change in plaintiff's factual circumstances warrants alteration of the judgment.

Defendant argues further that Mody's death renders the front pay award an unjust windfall.   Similar to the claims considered by the jury, the Court awarded front pay based on the facts presented at trial.  As matter of course, front pay award requires the Court to engage in a prediction of future events which may not necessarily ever occur.  See Goico v. Boeing Co., 347 F.Supp.2d 986, 992 (D.Kan. 2004) ("unknowable factors always make a front pay award somewhat speculative").  Accordingly, the Court finds that abatement is not appropriate as to any of plaintiff's claims.

Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50(b), the Court may enter judgment as a matter of law if a jury returns a verdict for which there is no legally sufficient evidentiary basis.  The Court must give deference to all credibility determinations and reasonable inferences of the jury, without weighing the evidence or assessing the credibility of the evidence.  Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 289 (2d Cir. 1998).

The Court may not substitute its judgment for that of the jury.  LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 429 (2d Cir. 1995).   Judgment as a matter of law may only be granted if there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or if there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it.  Cruz v. Local Union No.3 of the Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1154 (2d Cir. 1994).

The Court must view the evidence in the light most favorable to the party in whose favor the verdict was rendered, giving that party the benefit of all reasonable

inferences that the jury might have drawn in his favor.  Norton v. Sam's Club, 145 F.3d 114, 118 (2d Cir. 1998).

Discharge

Defendant argues in favor of judgment as a matter of law on plaintiff's retaliatory discharge claim because plaintiff failed to prove a causal connection, defendant reasonably believed that Mody abandoned his job, and defendant would have taken the same action regardless of alleged retaliatory intent.

Defendant's first and second arguments fail because sufficient evidence supports the jury's finding of a retaliatory discharge.  A trial court should only "rarely" disturb a jury's assessment of witness credibility or weight of the evidence.  See Brewster v. City of Poughkeepsie, 447 F.Supp.2d 342, 347 (S.D.N.Y. 2006).  Plaintiff adduced sufficient evidence for the jury to infer that a causal connection existed between Mody's protected activity and the alleged retaliatory discharge.  A causal connection between a protected activity such as complaints of discrimination and an adverse employment action can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.  Manoharan v. Columbia Univ. Coll. of Phys. & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988).  Here, plaintiff's evidence indicated that the events culminating in plaintiff's retaliatory discharge commenced shortly after plaintiff complained about his failure to be promoted.    The jury could have reasonably inferred that plaintiff was effectively discharged by the March 5 letter (received by plaintiff on March 10) providing that plaintiff would be discharged if he did not attend work by March 7.

Defendant cannot prevail on its third argument, a mixed motive theory that it

would have taken the same action regardless of any alleged retaliatory intent.  Such defense was clearly waived by counsel at trial.

Other Adverse Actions

Defendant argues that judgment as a matter of law should enter on any alleged retaliatory adverse employment action that occurred prior to Mody's termination. Defendant asserts that the actions that plaintiff complained about do not constitute adverse employment action pursuant to the "materially adverse" standard of Burlington Northern & Santa Fe Railway Co. v. White, 126 S.Ct. 2405, 2415 (2006).

A materially adverse employment action is one that might dissuade a reasonable worker from making or supporting a charge of discrimination.  Id.  Burlington instructs that the significance of an alleged retaliatory act depends upon the particular circumstances and context of the workplace.  Here, plaintiff adduced evidence that, after he made his complaint of discrimination, his attendance was monitored, he received poor performance reviews and unjustified reprimands, he was assigned demeaning work and lost his major responsibilities on projects, he was denied a transfer, his disability pay was reduced, and he was suspended.   The jury was instructed to consider whether any actions by GE, other than plaintiff's termination, also constituted adverse employment actions.

Sufficient evidence exists to support a jury finding that such actions were materially adverse.  As discussed relevant to the termination claim, the jury was permitted to find causation based on the temporal proximity between the plaintiff's protected activity and the retaliatory acts.   The motion for judgment as a matter of law on the adverse actions other than termination will be denied.

<u>Evidentiary Proof of Punitive Damages</u>

Defendant maintains that judgment as a matter of law should enter on plaintiff's punitive damages award because plaintiff failed to prove that defendant acted with evil motive or intent or reckless indifference to plaintiff's federally protected rights.  <u>Kolstad v. American Dental Ass'n</u>, 527 U.S. 526, 529-30 (2001).   Similarly, defendant urges the Court to set aside the ADEA liquidated damages award because plaintiff failed to establish that defendant acted with "reckless disregard" of his rights.  <u>See</u> <u>Trans World Airlines, Inc. v. Thurston</u>, 469 U.S. 111, 127 (1985) ("reckless disregard" standard applies to ADEA liquidated damages).  Defendant also sets forth that punitive damages are not appropriate because it acted in good faith compliance with advice of counsel and its antidiscrimination policy.

As previously discussed, the jury could reasonably infer from the evidence that, until his job termination, plaintiff endured numerous acts of retaliation for his protected activity.  Plaintiff presented evidence that he suffered from kidney disease requiring dialysis, and that at least McDonald was aware of plaintiff's need for dialysis.  Further, the jury heard evidence that plaintiff took a leave of absence due to job-related stress and that defendant decided not to pay him his full disability benefits, although he had serious and costly needs.  The jury also considered direct evidence that defendant's senior management planned to terminate plaintiff when he returned from his leave of absence after McDonald requested him to perform the task that plaintiff had previously described as demeaning and retaliatory.  Accordingly, this evidence is sufficient for the jury to infer that defendant acted either with malicious intent or reckless disregard for Mody's federally protected rights.

Defendant invokes the defense articulated in <u>Kolstad</u>, 527 U.S. at 545, which holds that, "in the punitive damages context, an employer may not be vicariously liable for the discriminatory employment decisions of managerial agents where these decisions are contrary to the employer's good-faith efforts to comply with Title VII." In <u>Kolstad</u>, the Supreme Court provided examples of intentional discrimination that does not give rise to punitive damages: (1) where the employer believes that it can lawfully discriminate; (2) where the theory of discrimination is novel or poorly recognized; or (3) where the employer believes that its discrimination falls within a statutory exception. <u>Id.</u> at 536-37.

The <u>Kolstad</u> defense is one made in the affirmative that should be considered by a jury according to proper instructions. <u>Zimmermann v. Associates First Capital Corp.</u>, 251 F.3d 376, 385 (2d Cir. 2001). In this instance, the jury did not receive a <u>Kolstad</u> defense instruction, and defense counsel did not object to its omission. Accordingly, it appears that defendant has waived this defense. Even considering the record evidence, the Court does not find that defendant established this defense as a matter of law.

Defendant advances its claim of good faith adherence to advice of legal counsel in reliance upon <u>Farias v. Instructional Sys., Inc.</u>, 259 F.3d 91, 102 (2d Cir. 2001). In that case, plaintiff had been denied certain termination benefits because terminated employees were required by company policy to release all claims against the company in exchange for severance benefits. Plaintiff had filed a federal claim against her employer, and legal counsel had advised that company policy prohibited offering the severance benefits. The jury's consideration of a punitive damages instruction was not

warranted because the employer had taken the wrongful retaliatory action upon advice of counsel that such conduct was in fact lawful.

According to defendant, the instant evidence demonstrates that McDonald consulted with Grace Han, GE's Senior Labor and Employment Counsel, prior to defendant placing Mody on suspension without pay, instructing Mody to return to work by March 7, 2003, and terminating Mody's employment. Defendant submits that Han was "on board" with the employment decisions concerning Mody. These circumstances are distinguishable from Farias, which concerned only one discrete retaliatory act directly. From the evidence presented, the Court cannot assess the scope or content of legal counsel's advice. Thus, the defense of reliance on legal counsel cannot as a matter of law serve to insulate the conduct that plaintiff's counsel asked the jury to consider as retaliation.

Defendant's assertion that it took action pursuant to a good faith effort to enforce its antidiscrimination policy also fails. Defendant has not proved, as a matter of law, that good faith efforts were actually made to enforce such policy.

As part of its antidiscrimination policy, GE managers are charged with conducting a thorough investigation of discrimination or retaliation complaints. However, plaintiff presented sufficient evidence for a jury to infer that such thorough investigations did not occur in plaintiff's case. Although GE has a policy that it uses merit and other job-related criteria as the sole bases for employment-related decisions, Fuselier testified that managers also noted that minority status of individuals was a factor in employee development. Accordingly, defendant is not entitled to judgment as a matter of law on this defense.

Excessiveness of Punitive Damages Award

Defendant advances several arguments in favor of the Court granting a new trial or remittitur. First, defendant posits that due process requires a new trial or remittitur on the $10 million punitive damages award.

A remittitur pursuant to Federal Rule of Civil Procedure 59 compels a plaintiff to choose between reduction of an excessive verdict and a new trial. Cross v. New York City Transit. Auth., 417 F.3d 241, 258 (2d Cir. 2005). Punitive damages must be "reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." Pacific Mutual Life Ins. Co. v. Haslip, 499 U.S. 1, 21 (1991). A punitive damages award will not be disturbed unless the amount is "so high as to shock the judicial conscience and constitute a denial of justice." O'Neill v. Krzeminiski, 839 F.2d 9, 13 (2d Cir. 1988). In reviewing a punitive damages award, a court must construe the evidence in the light most favorable to the nonmoving party. Scala v. Moore McCormack Lines, Inc., 985 F.2d 680, 683 (2d Cir. 1993).

In BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996), the Supreme Court set forth three guideposts that courts must consider in reviewing the constitutionality of punitive damages: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 417 (2003).

<u>Degree of Reprehensibility</u>

The Supreme Court instructed that the degree of reprehensibility is generally the "most important indicium of the reasonableness of a punitive damages award." <u>Gore</u>, 517 U.S. at 575. In determining the degree of defendant's reprehensibility, the Court must assess whether: (1) the harm caused was physical as opposed to economic; (2) the tortious conduct demonstrated indifference to the health or safety of others; (3) the conduct involved repeated actions as opposed to an isolated incident; and (4) the harm resulted from intentional malice, trickery, deceit as opposed to mere accident. <u>State Farm Mut. Auto. Ins.</u>, 538 U.S. at 419.

In this instance, the evidence supports the jury's finding of a significant degree of reprehensible conduct. Plaintiff endured a continuous campaign of retaliatory acts by a group of high level managers that served to demean plaintiff and eventually caused him health-threatening stress. Defendant's acts are rendered more reprehensible by the fact that McDonald was aware that plaintiff required dialysis. In light of plaintiff's fragile health condition, plaintiff was unable to secure a comparable position after his termination. Thus, defendant's termination of plaintiff's employment effectively deprived plaintiff of continuing to make a living in his profession. <u>See</u> <u>Iannone v. Frederic R. Harris, Inc.</u>, 941 F.Supp. 403, 415 (S.D.N.Y. 1996) (retaliatory action deprived plaintiff of her livelihood).

The jury could also infer that defendant's managers engaged in some deceitful or malicious conduct in conspiring to terminate plaintiff's position regardless of his performance upon return from his leave of absence. The e-mail from Lavalle to McDonald indicated that they should wait until plaintiff returned from his leave of

15

absence so that they could ask him again to make the phone call to the DOL that plaintiff had previously found objectionable.  Lavallle's e-mail provided further that plaintiff would lose his position regardless of his response.

The jury could also infer malice from defendant's decision not to afford plaintiff full benefits during his leave of absence.

At the same time, the evidence also supports a reduction in the punitive damages awarded since defendant's conduct involved no violence, and it did not imperil the health or safety of a broad scope of individuals.  The punitive damages award will not serve to safeguard a large public from future danger stemming from the reprehensible conduct at issue.  Accordingly, although defendant's conduct as to plaintiff merits a substantial award of punitive damages, this first factor weighs in favor of some reduction to the jury's punitive damages award.

Disparity Between Punitive Damages and the Harm

As to the second factor, the Supreme Court has declined to impose a bright-line ratio between compensatory and punitive damages.  State Farm, 538 U.S. at 424-25. Most recently, Philip Morris v. Williams, 127 S.Ct. 1057, 1061 (2007) referenced the "longstanding historical practice of setting punitive damages at two, three, or four times the size of compensatory damages."  While such ratios are not binding, they are "instructive" and demonstrate that single-digit mulitpliers are more likely to comport with due process than awards with ratios involving three-digit multipliers.  State Farm, 538 U.S. at 425.

In Pacific Mut. Life Ins., the Supreme Court concluded that a four to one ratio was "close to the line" of excessiveness, but did not "cross into the area of constitutional

impropriety." 499 U.S. at 23-24. Two years later, the Supreme Court concluded that a ratio of ten to one represented the upper limit of constitutionally-permitted punitive damages. TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 462 (1993). Second Circuit precedent teaches that ratios exceeding single digit ratios may be appropriate where a plaintiff receives an insignificant or nominal compensatory award. Fabri v. United Techs. Int'l, Inc., 387 F.3d 109, 126 (2d Cir. 2004).

The parties dispute how the amount of harm should be calculated. Plaintiff maintains that the harm includes the $500,000 in emotional distress damages, $652,768 in back pay, and $730,406 in front pay to total $1,883,174. Defendant appears to have conceded that the harm includes at least the emotional distress and back pay. The Court finds that plaintiff's harm constitutes his emotional harm and his economic loss as reflected in his front pay and back pay awards. See Salitros v. Chrysler Corp., 306 F.3d 562, 576 (8th Cir. 2002) (proper to compare amount of punitives to front pay award); Greenbaum v. Svensk Handelsbanken, 67 F.Supp.2d 228, 270 (S.D.N.Y. 1999) (back pay award in discrimination cases reflects harm where no front pay was awarded). According to this analysis, the ratio between the punitive damages and the harm suffered is approximately 5:1. In the event that the front pay award is not appropriate in this case, the Court also considers the ratio between punitive damages and the harm of $1,152,768 comprising the emotional distress and back pay. Under this alternative calculus, the ratio between punitives and harm is roughly below 10:1.

In light of the substantial amount of damages already awarded to compensate plaintiff, these ratios underscore the excessiveness of the $10,000,000 award.

Decisions involving discrimination claims within this circuit have generally approved ratios of less than 5:1.  See Kauffman v. Maxim Healthcare Services, Inc., – – F.Supp.2d – – , 2007 WL 2506026 (E.D.N.Y.) (ratio of 11:1 remitted to 4:1); Iannone, 941 F.Supp. 403 (ratio of 10:1 remitted to approximately 2:1); Parrish v. Sollecito, 280 F.Supp.2d 145, 164 (S.D.N.Y. 2003) (based on low degree of reprehensibility and harm, a multiplier of less than 4 was appropriate); but see  Colbert v. Furomoto Realty, Inc., 144 F.Supp.2d 251, 258 (S.D.N.Y. 2001) (6:1 ratio for housing discrimination claim did not violate due process).  Accordingly, the second factor also supports reduction of the punitive damages.

Disparity Between Punitive Damages and Civil Penalties Imposed for Comparable Misconduct

The final guidepost involved in review of punitive damages is a comparison of the punitive damages awarded and the civil or criminal penalties that could be imposed for comparable misconduct.  Gore, 517 U.S. at 574-575.  Such analysis enables the Court to align the punitive damages award to the legislature's assessment of an appropriate sanction for the conduct at issue.  Id.

Congress capped Title VII damages for the retaliatory conduct experienced by plaintiff at $300,000.  42 U.S.C. § 1983a(b)(3).  Under CFEPA, punitive damages are considered to be limited to fees and costs.[2]  See Ford v. Blue Cross and Blue Shield of CT, Inc., 216 Conn. 40, 59 (1990).  The ADEA limits wilful violations to awards of liquidated damages that are equal to lost wages.  29 U.S.C. § 626(b).   However,

---

[2]Since Section 1981 is a federal statute, the Court's discussion is largely devoted to the limitations on damages recoverable pursuant to the federal statutes.

Congress imposed no limits on punitive damages recovered pursuant to section 1981.

The discrepancy between punitive damages awards pursuant to Title VII, ADEA and

Section 1981 indicates that Congress foresaw that larger punitive damages award

under section 1981 could be appropriate.  Kauffman, 2007 WL 2506026 at *8.  The

restriction on Title VII or ADEA damages does not militate in favor of this Court

reducing the award to equal Title VII punitive damages or ADEA liquidated damages.

Nevertheless, the fact that Congress limited damages on Title VII and ADEA damages

for comparable conduct weighs in favor of reducing the jury's punitive damages award.

Remittitur of Punitive Damages Award

In making its reduction of the jury's punitive damages award, the Court is mindful

that the purpose of such award is to punish defendant and deter future similar conduct.

In light of the significant degree of reprehensibility at issue, the Court finds that a

punitive damages award of $5,000,000 is appropriate.  Pursuant to such an award, the

ratio of punitive damages to harm is either: approximately 2:1 (harm includes emotional

distress, back pay and front pay); or somewhat under 5:1 (harm includes emotional

distress and back pay).  In consonance with the jury's goal of imposing a strong

punishment and deterrent upon defendant, this award of $5 million is in the upper range

of a constitutionally-permitted punitive damages award.  If plaintiff does not accept the

remittitur, the Court shall vacate the punitive damages award and conduct a new trial

limited to the question of punitive damages. See Vasbinder v. Scott, 976 F.2d 118, 123

(2d Cir. 1992).

Liquidated Damages and Punitive Damages

Defendant asserts that it is legal error to award both liquidated damages under

the ADEA and punitive damages under § 1981. Defendant maintains that such awards afford plaintiff "double damages" for the same misconduct.

The Court recognizes that ADEA's liquidated damages are punitive in nature. Trans World Airlines, Inc., 469 U.S. at 125. However, this case does not implicate the danger of a double punitive recovery, since the ADEA liquidated damages award relates only to misconduct stemming from retaliation for complaints of age discrimination, while the section 1981 punitive damages award relates to misconduct stemming from retaliation for complaints of racial discrimination.

Further, as at least the First Circuit has held, the legal bar against multiple recoveries is inapplicable in the context of punitive damages, which serve to deter and punish rather than to compensate for misconduct. Rodriguez-Torres v. Caribbean Forms Manufacturer, Inc., 399 F.3d 52,67 (1st Cir. 2005).

Accordingly, the Court will sustain the award of both liquidated and punitive damages as appropriate.

Evidence of Non-Economic Damages

Defendant asserts that the jury's award of non-economic damages cannot be sustained because it is unsupported by evidence of "emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, [or] other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). Defendant argues further that the jury's award of $500,000 is excessive. The Court disagrees as to both arguments.

The jury assessed evidence that Mody's physical condition deteriorated during his last six months while employed by GE, and that plaintiff's health was so exacerbated by stress inflicted by defendant's retaliatory acts that plaintiff was required

to take a medical leave of absence. Mody also provided evidence that his health

continued to suffer after his termination due to stress attributable at least in part to

defendant's conduct. Accordingly, the Court finds that the evidence is sufficient to

support an award of noneconomic damages.

The Court also holds that the jury's award of $500,000 is not so excessive as to

"shock the judicial conscience and constitute a denial of justice." Krisch v. Fleet St.,

Ltd., 148 F.3d 149, 165 (2d Cir. 1998). To determine whether the award is within a

reasonable range, the Court must examine awards for comparable injuries. See Ismail

v. Cohen, 899 F.2d 183, 187 (2d Cir. 1990). Courts have affirmed high emotional

distress awards where the evidence demonstrated that a plaintiff had suffered

substantial damage. Ramirez v. New York City Off-Track Betting Corp., 112 F.3d 38,

41 n. 1 (2d Cir. 1997) ($500,000 award for pain and suffering does not shock the

conscience); Passantino v. Johnson & Johnson Consumer Prods., Inc., 212 F.3d 493,

514 (9th Cir. 2000) ($1 million dollar emotional distress damage award); Settlegood v.

Portland Public Schools, 2005 WL 1899376 (D.Or. 2005) ($500,000 in non-economic

damages awarded for civil rights retaliation claim pursuant to section 1983).

Accordingly, the Court will affirm the jury's award of $500,000 in non-economic

damages.

Prejudicial Admission of Evidence

Defendant asserts that a new trial is merited due to the admission of prejudicial

evidence that confused the jury. Defendant identifies as confusing and improper

testimony elicited by plaintiff's counsel concerning: (1) ages and races of individuals in

defendant's Senior Professional Band, Senior E-Band and E-Band; (2) diversity

"statistics" and the number of minorities and individuals over the age of 40 in senior management positions; (3) alleged adverse action; (4) whether certain action violated the "law against retaliation"; and (5) whether minority status was considered during performance reviews.

Defendant recognizes that its counsel did not object to much of the evidence that it now calls objectionable. Its brief indicates that it took no objection to the testimony concerning the ages and races of the individuals in defendant's senior professional and executive salary bands, the alleged adverse action, and whether Lavalle was aware that certain alleged action violated the law against retaliation.

Where no contemporaneous objection has been made, a new trial is only warranted if there was "plain error" that was "so serious and flagrant that it goes to the very integrity of the trial." Marcic v. Reinauer Transp. Cos., 397 F.3d 120, 124 (2d Cir. 2005).

The evidence to which defendant has only now objected does not meet this standard. Defendant asserts that such testimony concerning the ages and races of employees in the Senior Professional Band, Senior E-Band and E-Band was prejudicial and confusing because the jury was not reviewing a discrimination case. However, this evidence was relevant to plaintiff's showing of a "good faith belief" that the protected activity in which he engaged was covered by the statute. The alleged adverse employment actions are also relevant to the jury's assessment of defendant's treatment of plaintiff in the workplace. The Court's jury instruction served to eliminate any confusion as to plaintiff's actual claims and the standards for reviewing such claims. Further, Lavalle's testimony as to his awareness of whether certain action constituted

illegal retaliation was relevant to the question of whether liquidated and punitive damages were merited for a wilful violation or reckless indifference to plaintiff's federally protected rights. <u>See</u> <u>Parrish</u>, 280 F.Supp.2d at 152 (knowledge of law is relevant to punitive damages under Title VII).

Defendant posed objection to evidence concerning diversity statistics and the number of minorities and individuals over the age of 40 in senior management positions,[3] and whether minority status was considered during the GE "Session C" performance reviews. When a claim of error has been preserved by contemporaneous objection, a new trial is appropriate if a court's evidentiary ruling was "clear abuse of discretion" that was "clearly prejudicial to the outcome of the trial." <u>Marcic</u>, 397 F.3d at 124.

As previously discussed, evidence concerning diversity statistics and minority status and ages of individuals in senior management is relevant to plaintiff's proof that he brought his complaints in good faith. The Court overruled defendant's objection to the admission of testimony concerning whether minority status was considered for "Session C" performance reviews. The "Session C" documents, which had been admitted, contained references to the minority status of employees and therefore testimony regarding such documents was relevant to plaintiff's good faith in complaining of discrimination. Any juror confusion as to the scope or nature of plaintiff's claims was corrected by the jury instructions.

---

[3]Defendant objected to admission of this evidence in documentary form.

<u>Improper Argument by Plaintiff's Counsel</u>

Defendant complains that closing argument by plaintiff's counsel was so improper as to require a new trial. However, no objection was lodged as to content of the closing argument. Thus, the Court must examine whether allowance of comments by plaintiff's counsel constitutes "plain error." Specifically, defendant complains about (1) comments concerning the race and age of individuals promoted; (2) statements that defendant had subjected plaintiff to 40 acts of retaliation; (3) a comparison to Ford Motor Company's calculus for injuries related to the defective Pinto and whistleblowers involved in the Enron case; and (4) references to plaintiff's need for dialysis, plaintiff's wife's breast cancer, percentages of defendant's annual profits and income and profit margin on the Magic Panel project.

None of these comments is so prejudicial as to entitle defendant to a new trial. To the extent that any comment was prejudicial, the Court instructed the jury not to consider statements by counsel as evidence, and further instructed the jury as to the proper standards to review the evidence. A litigant is entitled to a fair trial but not necessarily a perfect one. <u>McDonough Power Equipment, Inc. v. Greenwood</u>, 464 U.S. 548, 552 (1984).

<u>Jury Instructions</u>

Defendant represents that a new trial is required due to errors in the jury instructions. Specifically, defendant maintains that the jury instruction misstated the law of causation as to the retaliation, failed to include the proper standard as to an adverse employment action, and permitted the jury to consider other alleged retaliatory acts that were not properly before it. The Court finds these arguments do not merit a new trial.

At trial, the parties agreed that the instructions should not contain a mixed-motive instruction. The parties later agreed that the Court should instruct the jury that:

> plaintiff must prove by a preponderance of the evidence that his complaint of discrimination was a "substantial" or "motivating" factor in the employment actions of which he now complains. . . . [Mody] need not prove that his complaint or complaints were the sole motivation for defendant's decision. He need only show that they played a part in defendant's decisions.

Defendant maintains that the Court erred by instructing the jury on one part of a mixed-motive instruction but failing to include the affirmative defense component applicable to a mixed-motive theory. The Second Circuit has explained that a mixed motivation charge differs from a substantial motivation charge only in asking the jury to consider whether the defendant has established the affirmative defense that it would have taken the same adverse action in the absence of an impermissible reason. Fields v. New York Office of Mental Retardation and Developmental Disabilities, 115 F.3d 116, 124 n. 4 (2d Cir. 1997).

Defendant takes issue with the special verdict form's failure to reference the "materially adverse" standard articulated by the Supreme Court in Burlington Northern, 126 S.Ct. at 2415. The special verdict form asked, "Do you find that plaintiff has proven by a preponderance of the evidence that his complaints of discrimination were a motivating factor for any other adverse employment action?" Any misunderstanding of the proper standard of evaluating an adverse employment action was cured by the substantive jury instruction: "In considering whether other actions by defendant constitute adverse employment action, you are to determine whether defendant engaged in a materially adverse action that would dissuade a reasonable worker from making or supporting a charge of discrimination." Accordingly, defendant was not

prejudiced by the omission of the word "materially" on the special verdict form.

Defendant asserts that the jury charge erroneously instructed the jury to consider other alleged retaliatory employment actions that had previously been disposed of on summary judgment. As both parties recognize, in Burlington Northern, the Supreme Court articulated a new standard for evaluating an adverse employment action that the Court had not applied on summary judgment. Defendant maintains that the Court should have instructed the jury that some of the allegedly adverse actions could not have dissuaded a reasonable person from complaining. The Court finds no error in its failure to limit the jury's consideration of evidence in light of its instruction as to the proper standard for evaluating the alleged retaliatory acts.

Defendant charges that following instruction is improper: "An employer cannot avoid liability by deliberately creating an alleged performance issue of an employee and then cite poor performance as the basis for the adverse action." This charge comports with the law. In Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1040 (2d Cir. 1993), the Second Circuit indicated that an employer may be held liable for discrimination or retaliation where the employer's wrongdoing contributed to the employer's asserted objective reason for the adverse action. See Simpson v. Diversitech Gen., Inc., 945 F.2d 156, 160 (6th Cir. 1991) (employer liability for Title VII violation where employee was discharged due to poor performance but record was "infected" by racial bias).

Finally, defendant assigns error to the following instruction as to whether plaintiff made reasonable effort to find suitable employment in order to mitigate his damages: "The reasonableness of the effort to find substantially equivalent employment should be evaluated in light of the individual characteristics of plaintiff,

such as his age and the job market."  The Court, noting that defendant did not preserve a contemporaneous objection to this instruction, finds that it committed no plain error in so instructing the jury.  Plaintiff's duty to mitigate his damages required him to make reasonable effort to find suitable employment.  Dailey v. Societe Generale, 108 F.3d 451, 456 (2d Cir. 1997).   This instruction follows the law that the reasonableness of plaintiff's efforts should be considered in accordance with the factual circumstances of the case.  See e.g., Watson v. E.S. Sutton, Inc., 2005 WL 2170659 (S.D.N.Y.) (plaintiff's decision to switch careers was not a deliberate choice to forgo more gainful employment and was reasonable in light of limited prospects in existing career industry).

Defendant's supportive citations are distinguishable.  Johnson v. Chapel Hill Indep. School Dist., 853 F.2d 375, 383 (5th Cir. 1988) scrutinized the district court's finding that a plaintiff had not unreasonably failed to mitigate her damages.  The Fifth Circuit held that the district court's conclusion that the plaintiff "was entitled to assume that because of her age it would be futile for her to seek employment" was incompatible with the court's finding that the plaintiff was also "a competent, experienced teacher." In Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269, 1278 (4th Cir. 1985), the Fourth Circuit examined the effect upon employer liability for back pay after a Title VII plaintiff has voluntarily terminated an interim employment position.  Brady held that an employer's back pay liability is not increased as a result of losses willingly incurred by the claimant.  Neither Johnson nor Brady militates in favor of a finding of plain error so as to necessitate a new trial.

<u>Attorney Fees and Costs</u>

As a prevailing plaintiff to this civil rights action, plaintiff is entitled to an award of reasonable attorney fees.  42 U.S.C. § 1988; 42 U.S.C. § 2000e-5k; 29 U.S.C. § 621; and Conn. Gen. Stat. § 46a-104.  Plaintiff has submitted two fee applications.  The first application relates to work on plaintiff's claims between February 2003 and November 10, 2006.  The supplemental application relates to work on post judgment motions. Plaintiff's first application seeks attorneys fees in the amount of $711,293.66, and $26,008.38 in costs.  Plaintiff asserts that it is entitled to attorney fees relevant to all causes of action, which were inextricably intertwined.  He represents that the fee amount should be upwardly adjusted by a multiplier of 1.2 due to the results obtained. In the supplemental application, plaintiff seeks fees in the amount of $134,531.50, a 20% upward adjustment and $3,079.58 in costs.

Defendant contests neither plaintiff's status as a prevailing party, nor the reasonableness of the hourly rates and the hours spent on the matter.  Defendant argues that the Court should reduce the attorney fees sought in the first application by 20% because plaintiff was not successful on all of his claims.

The Court must determine a presumptively reasonable amount of attorney fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate.  <u>Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany</u>, 493 F.3d 110, 118 (2d Cir. 2007).

The Court may consider whether the presumptively reasonable fee amount should be adjusted upward or downward based on "results obtained."  <u>Hensley v.</u>

Eckerhart, 461 U.S. 424, 434 (1983)[4]  In a case such as the instant one where a plaintiff has not prevailed on all of his claim, Hensley instructs that the Court should address:  (1) whether plaintiff failed to prevail on claims that were unrelated to the successful claims; and (2) whether the plaintiff achieved a level of success that renders the hours reasonably expended a satisfactory fee award.  In order to recover on the entire fee incurred on both successful and unsuccessful causes of action, the claims must be "inextricably intertwined" and involve a common basis in fact or legal theory. Reed v. A.W. Lawrence & Co, Inc., 95 F.3d 1170, 1183 (2d Cir. 1996).

Defendant's objection to plaintiff's application is well taken.  The Court granted summary judgment on plaintiff's claims of promissory estoppel, negligent misrepresentation, discrimination, and negligent infliction of emotional distress. Plaintiff's claim of retaliation in violation of the FMLA was rejected by the jury.  The Court finds that plaintiff's claims of promissory estoppel and negligent misrepresentation and FMLA retaliation are not inextricably intertwined with his claim that defendant retaliated against him after making complaints of discrimination.  The negligent misrepresentation and promissory estoppel claims are unrelated to the adverse employment action.  Rather, these claims stem from representations made

_____

[4]In addition to the "results obtained," the following factors also may be considered: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  Id. at 430 n.3.

during plaintiff's job interview.  The FMLA claim is distinguishable from the other retaliation claims, which evolved from plaintiff's complaints of discrimination.  By contrast, the basis of plaintiff's FMLA claim is alleged retaliation against plaintiff due to exercise of his FMLA rights during his leave of absence.

Plaintiff has submitted that the fees for the period between February 2003 and November 10, 2006 equal $433,973.25.  The Court will reduce this amount by a percentage because the Court cannot discern the time attributable to the unsuccessful claims from the time records submitted.  Reiter v. Metropolitan Trans. Authority of the State of New York, MTA, 2007 WL 2775144 at *14 (S.D.N.Y.).  The Court will reduce the amount by 10% for work related to the negligent misrepresentation and promissory estoppel, and 10% for the FMLA claim.   Accordingly, the Court finds that $390,575.93 represents the amount reasonably expended on the successful claims for the period ending with November 10, 2006.   To that amount, the Court adds $134,531.50 representing the fees reasonably expended on post-trial motions relating to the successful claims, which amount totals to $525,107.43.

However, the Court should still make an upward adjustment on this attorney fee amount to reflect the "results obtained" on the claims submitted to the jury.  The Supreme Court has provided that "the most critical factor" in determining the reasonableness of a fee award is the degree of the success obtained.  Farrar v. Hobby, 506 U.S. 103, 114 (1992).  In this instance, the "results obtained" were startling.  As reflected by the jury awards, counsel presented a highly persuasive case that plaintiff had suffered wrongful action and was entitled to a generous amount of compensatory and punitive damages.  At trial, the case did not present any novel issues of law, but it

was lengthy and involved voluminous evidence requiring a high degree of skill from plaintiff's counsel.  Further, the case has required extensive post-trial briefing.  Accordingly, the Court will apply a multiplier of 1.2 to $525,107.43.  Therefore, the Court will award attorney fees in the amount of $630,128.91.

Costs

Plaintiff is also entitled to an award of costs for those reasonable disbursements incurred by attorneys and charged to their clients.  LeBlanc-Sternberg v. Fletcher, 143 F.3d 748, 763 (2d Cir. 1998).  Plaintiff's counsel has submitted affidavits in support of its applications for costs.  Defendant's opposition briefs make no specific objection to plaintiff's request for costs.  Accordingly,  upon review, the Court finds that plaintiff should be awarded $29,087.96 in costs.

**CONCLUSION**

Based on the foregoing, the motion for judgment as a matter of law is DENIED [doc. 163]; the motion for a new trial or for remittitur [doc. 168] is GRANTED only as to the remittitur.  The Court remits the punitive damages award to $5 million.

The motions for attorney fees and costs [docs. 157 and 186] are GRANTED.  Plaintiff shall be awarded $630,128.91 in attorney fees and $29,087.96 in costs.

Within thirty days of this order, plaintiff must indicate to this Court whether it accepts the remittitur, or the Court shall vacate the punitive damages award and order a new trial limited to the question of punitive damages.

Dated this _15th____ of October, 2007 at Bridgeport, Connecticut.


_____/s/_____
Warren W. Eginton
Senior United States District Judge